IN RE ESTATE OF Herbert C. WEBER, a/k/a Herbert C. Weber, Sr., a/k/a Herb C. Weber, Sr., Deceased: HUB CITY FOODS, INC., Appellant, v. DEPARTMENT OF REVENUE, Respondent.

Supreme Court

*No. 76–232. Argued October 3, 1978.—*
*Decided November 28, 1978.*
(Also reported in 271 N.W.2d 657.)

For the appellant there were briefs by *Roger C. Minahan, John B. Haydon, James W. Mohr, Jr.,* and *Whyte & Hirschboeck, S. C.,* of Milwaukee, and oral argument by *Mr. Minahan.*

For the respondent the cause was argued by *Allan P. Hubbard,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

DAY, J. Hub City Foods, Incorporated, appellant (hereafter Hub City) appeals the order of the Wood County Court determining inheritance tax, entered May 27, 1976, and the order of the Wood County Court denying Hub City's request for a six percent interest rate, entered October 14, 1976.

The principal question raised is:

When a shareholder of a closely held corporation enters into an agreement with the corporation providing for the mandatory redemption of his shares at a fixed price, does the price stipulated in the agreement establish the value of the stock for state inheritance tax purposes?

We hold that under the stipulated facts in this case, a presumption arose that the price fixed was the market value of the shares. This presumption was not overcome and we therefore reverse.

The facts as set forth in the stipulation entered into by the parties are as follows. Hub City Foods, Incor-

porated (formerly known as Hub City Jobbing Co.), a closely held corporation, is a regional wholesale food distributor. In January, 1962, Hub City had an authorized capital of $90,000 divided into 900 shares of common stock of $100 par value per share. All of the shares were issued and outstanding. Herbert C. Weber (hereafter the decedent) owned 441 of those shares, and his brother Hubert J. Weber owned the remaining 459 shares. Deceased was the father of three sons, none of whom were employed by the company. Hubert J. Weber had three daughters and one son. Hubert's son and a son-in-law were employed in executive positions with the company.

On January 16, 1962, the decedent and Hub City entered into a stock redemption contract. The contract provided that the decedent during his lifetime could transfer his stock by gift only to his children, grandchildren, or to a custodian or a trust for the exclusive benefit of the children or grandchildren. He could not otherwise sell, assign or transfer any of his shares. Any stock transferred under the contract was subject to the restriction that on the death of the decedent, Hub City was required to buy, and the decedent's estate and all of his transferees were required to sell, all the shares owned by the decedent at the time the stock redemption contract was executed. All stock subject to the redemption agreement was required to bear a restrictive legend referring to the agreement. Each share did bear such a legend. The contract specified that the consideration for the purchase was to be made up of three items:

a. a certain, described parcel of real estate together with all personal property therein; or if Hub City did not own the real estate at the time, or did not convey it, the sum of $100,000 as liquidated damages;

b. $20,000 in cash;

c. $180,000 in nine equal annual installments of $20,000, the unpaid principal to bear interest at the rate of five percent per annum.

On February 2, 1962, Hub City recapitalized, and the decedent's shares were exchanged for 441 shares of Class A voting stock and 3,969 shares of Class B non-voting stock, for a total of 4,410 shares, subject to the buy-sell agreement.

The decedent died testate on March 4, 1970. His will was admitted to probate by order of the Wood County Court, Probate Branch. At the time of his death, he owned 441 shares of Class A voting $10 par value common stock of Hub City and 1,953 shares of Class B non-voting $10 par value common stock of Hub City, all of which were inventoried in his estate. The other shares had been transferred to his descendants, subject to the restrictions in the agreement.

Following decedent's death, all of the shares of Hub City Class A voting stock and Class B non-voting stock subject to the stock redemption contract were acquired by Hub City in accordance with the terms of the contract. The price paid for the block of stock under the contract came to $68 per share.

On May 1, 1974, the Wisconsin Department of Revenue notified the personal representative of the decedent's estate, that, in its opinion, the stock redemption contract did not determine the value of the stock. A series of communications between the personal representative and the Department of Revenue followed. On February 24, 1975, the personal representative of the estate gave notice to Hub City that on March 18, 1975, the Probate Court would determine the inheritance tax on the estate. Hub City was given additional time beyond March 18, 1975 to prepare its argument that the stock redemption contract determined the value of the stock.

On February 17, 1975, the Probate Court signed an order amending the inventory for the estate, fixing a value for the stock owned by the decedent at $125 per share. On May 7, 1975, Hub City petitioned the court for an order to show cause why the order of February

17, 1975 should not be vacated. On June 6, 1975, the court entered an order vacating the February 17, 1975 order.

On December 23, 1975, Hub City and the Department of Revenue entered into an extensive stipulation of facts not in dispute. A hearing was held before the Honorable Byron B. Conway, Wood County Judge on April 5, 1976. Expert witnesses for the Department of Revenue and Hub City gave their opinions on the value of Hub City stock as of the decedent's date of death. Briefs were exchanged and the court issued its written decision dated May 18, 1976, deciding that the value of the Hub City stock was to be determined after the corporation received it, that the preponderance of the credible evidence justified a valuation of the stock at $160 per share, and that Hub City received an inheritance of $92 per share—the difference between the court determined value of stock ($160 per share) and the price paid by Hub City for the stock ($68 per share).

On October 14, 1976, the court denied a request by Hub City that a six percent interest rate be charged on the unpaid inheritance tax. The court, instead, fixed a ten percent rate of interest, because Hub City could have made a tender of the tax due. On the same date, the court extended to October 15, 1976, the time within which Hub City could file its notice of appeal. This appeal followed.

At the time of decedent's death, inheritance tax on transfers made in contemplation of death was governed by sec. 72.01(3), Stats. 1969. That statute provides:

"72.01. **Subjects liable.** A tax shall be and is hereby imposed upon any transfer of property, real, personal or mixed, or any interest therein, or income therefrom in trust or otherwise to any person, association or corporation, in the following cases, except as hereinafter provided: . . .

"(3) TRANSFERS IN CONTEMPLATION OF DEATH OR TO TAKE EFFECT AFTER DEATH. . . (b) When a transfer is of

property, made without an adequate and full consideration in money or money's worth by a resident or by a nonresident when such nonresident's property is within this state, or within its jurisdiction, by deed, grant, bargain, sale or gift, intended to take effect in possession or enjoyment at or after the death of the grantor, vendor or donor, including any transfer where the transferor has retained for his life or for any period not ending before his death: 1. the possession or enjoyment of, or, the right to the income, or to economic benefit from, the property, or 2. the right, either alone or in conjunction with any person, to alter, amend, revoke or terminate such transfer, or to designate the beneficiary who shall possess or enjoy the property, or the income, or economic benefit therefrom."

■

Thus, for the statute to apply, two conditions must be satisfied: 1) the transfer of property must have been "intended to take effect in possession or enjoyment at or after the death of the grantor, vendor or donor," and 2) the transfer must have been "made without an adequate and full consideration in money or money's worth."

Sec. 72.24(2), Stats. 1969, defines "transfer" as follows:

"72.24. **Definitions.** As used in ss. 72.01 to 72.24: . . . (2) The word 'transfer' includes the passing of property or any interest therein in possession or enjoyment, present or future, by inheritance, descent, devise, succession, bequest, grant, deed, bargain, sale, gift or appointment in the manner prescribed in ss. 72.01 to 72.24."

■

Sec. 72.01(8), Stats. 1969, provides that the tax imposed by Chapter 72 is on the clear market value of the property.[1]

---

[1] "Sec. 72.01. **Subjects liable.** . . . (8) BASIS OF TAX. The tax so imposed shall be upon the clear market value of such property, less the deductions and exemptions provided in this chapter, at the rates hereinafter prescribed.

Hub City concedes that the transfer was intended to take effect in possession or enjoyment at or after the grantor's death. But it maintains that Hub City paid full value for the shares based on what a willing buyer would have paid to a willing seller on the date of death. According to Hub City the clear market value of the shares for inheritance tax purposes was $68 per share—the price fixed by the 1962 stock redemption contract. This was, in fact, the price Hub City paid for the stock.

The Department of Revenue contends that Hub City's argument ignores the essential difference between the Wisconsin inheritance tax and federal estate tax. The inheritance tax is based on the value of the interest to which the living succeeds; an estate tax taxes the value of the estate as a whole to the decedent. *Estate of Ogden,* 209 Wis 162, 244 N.W. 571 (1932); *Estate of Michel,* 262 Wis. 432, 55 N.W.2d 388 (1952); *Estate of Banta,* 273 Wis. 328, 77 N.W.2d 730 (1956); *In Matter of Estate of Stevens,* 74 Wis.2d 1, 245 N.W.2d 673 (1976).

In *Estate of Banta, supra,* the testatrix owned 3,151 shares in the George Banta Publishing Company. By the time of her death she had also acquired fifty shares of the stock from the estate of her late husband. She entered into a contract with her son in which she agreed to transfer her 3,151 shares, plus any she might receive from her husband's estate, to her son within a year of her death for $15 per share. He in turn agreed to purchase the stock. It was found to be worth $275 per share at the time of her death. Her son bought the shares from the estate. This court in holding that the value was to be the value at the time of her death or $275 per share, said: "parties may not bind the state to their own stipulation of value of property, other than an adequate and full consideration at the time of transfer, when such property is intended to come into possession and enjoyment by the transferee or after the death of the grantor, vendor, or donor." *Id.* at 332.

The court also commented:

"Appellants call our attention to the fact that the federal tax authorities valued this stock at $15 per share in United States inheritance-tax proceedings. We do not consider this a guide to an interpretation of the Wisconsin inheritance-tax liability. The United States taxes the estate as a whole and it may be perfectly proper for it to note that by Mrs. Banta's contract this stock was worth no more to her estate than $15 per share. But Wisconsin is not concerned with the total estate. It taxes the property interest which passes to an individual upon the former owner's death. 'An "estate tax" taxes not the interest to which some person succeeds on a death but the interest which ceases by reason of the death; while the inheritance tax is based on the interest to which the living succeeds.' *Estate of Ogden,* 209 Wis. 162, 167, 244 N.W. 571 (1932)." *Id.*

However, there are significant factual distinctions between *Banta* and the case at bar. In *Banta* a natural object of the testator's bounty, her son, was the beneficiary of the $260 difference between the contract purchase price and the market value of the shares. The corporation was not a natural object of the testator's bounty in the case before us. Nor is there anything in the record that the purpose of the contract was to benefit the deceased's brother or his brother's descendants.

Neither the brother nor the brother's descendants were beneficiaries under decedent's will.

In each of the years 1967, 1968 and 1969, the dividends paid per share was $6. This would amount to a return of 8.8% on $68 per share, comparable to return on savings and loan or bank time certificates. This would show the $68 value per share agreed upon was not unreasonable. The record in *Banta* shows that the beneficiary, George Banta, Jr. was active in the management of the company, none of descendants' children were in this company and did not stand to gain by the sale of the stock. No "windfall" accrued to the natural objects of testator's bounty

by the sale of stock on death as occurred in *Banta*. From the stipulation in the case before us there is nothing to indicate that this was not an arm's length transaction by a minority stockholder and the corporation.

We hold that under the facts of this case as stipulated by the parties that where a closely held corporation and a minority shareholder enter into an arm's length agreement binding the corporation to purchase and the shareholder (or his assignee) to sell his stock at a specified price at the shareholder's death, and the restriction is indicated on the face of the stock there is a presumption raised that the amount agreed upon is the market value of the stock at the time of death. Such presumption can only be overcome by a showing that the agreement was not at arm's length or would result in a windfall of reasonably marketable shares of stock to the corporation or result in a windfall to the natural objects of the deceased's bounty or to persons the deceased wanted to benefit. There is no such showing here.

We are bound by the stipulation entered into between the corporation and the Department. The deceased gave up any chance to pass the stock on to his heirs at law, *i.e.*, his three sons, by the agreement to sell. He also gave up any chance that his estate would benefit from any possible appreciation in value of the stock because of the agreement to take a sum which when divided by the number of shares amounted to $68 per share. On the other hand it placed his estate in the position of being guaranteed such sum even if the stock depreciated in value.

From the standpoint of the corporation it was assured that it would remain a close corporation without outsiders acquiring an interest in the business and at a definite price.

This being an admittedly close corporation requires that the presumption raised on those facts be overcome.

There is nothing in the stipulation or exhibits to indicate this was not an arm's length transaction at the time it was entered into. This could be shown in a proper case by extrinsic evidence but we find none here. Nor is there any showing that it resulted in a windfall to the corporation in the form of the shares being reasonably marketable at a price in excess of that paid for such shares. There is no showing that there was any market for the shares. Minority shares in a close corporation are frequently of little value because of the lack of effective voice in the policies of the corporation on the part of the minority.

The record here shows the stock was not sold and that the net worth and cash position by the corporation was reduced as a result of the obligation of the corporation to buy the deceased's shares.

It is these facts and the inferences to be drawn therefrom that distinguish the case before us from *Estate of Banta.* We therefore reverse the order of May 27, 1976, and hold that no tax is due. Because we hold that no tax is due, we do not reach the issue of the interest charged.

*By the Court.*—Order reversed.